Filed 10/15/20  P. v. Olivas CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PEDRO JOAQUIN OLIVAS,<br><br>        Defendant and Appellant. | A159163<br><br>(San Mateo County<br>Super. Ct. No. SC058741A) |

Defendant filed a petition for resentencing under Penal Code[1] section 1170.95.  The trial court denied defendant's petition, finding he was convicted as the actual killer.  Defendant's appellate counsel has filed a brief in which he raises no issues and asks us to review the record independently under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).  Counsel has advised defendant of his right to file a supplemental brief to bring to this court's attention any issue he believes deserves review.  Defendant did not do so.  Our review of the entire record reveals no arguable issues cognizable in this appeal.  We therefore affirm.

## PROCEDURAL BACKGROUND

The San Mateo County District Attorney's Office charged defendant on June 2, 2005 with murder (§ 187, subd. (a)) and assault on a child resulting

[1] All statutory references are to the Penal Code.

in death (§ 273ab).  A jury convicted him in 2007 of both charges.  The court sentenced defendant to 25 years to life in prison.  The Court of Appeal affirmed his conviction and sentence in 2009.  (*People v. Olivas* (Oct. 29, 2009, A120088) [nonpub. opn.].)

In March 2019, defendant filed a petition for resentencing under section 1170.95.  He alleged he was not the actual killer, did not have the intent to kill, was not a major participant in a felony, and could not be convicted of murder because of changes to section 188.  The trial court appointed counsel to represent defendant.

The court denied defendant's petition for resentencing explaining that after reviewing the documentation, it was apparent defendant was convicted as the actual killer.

## FACTUAL BACKGROUND

We derive the facts from our prior nonpublished opinion upholding defendant's conviction, *People v. Olivas, supra*, A120088.

L.E. lived at her sister's house with her sister's family and a second sister.  L.E. gave birth to Fernando in October 2002.  Three months later, she returned to work leaving the infant with her sisters.  On April 5, 2004, L.E. moved out of her sister's home and into an apartment.

Shortly after midnight on April 9, 2004, L.E. and defendant brought Fernando, then 17 months old, to the Seton Medical Center in Daly City.  Though breathing, he was unconscious and unresponsive.  Dr. Mark Alderdice and the medical staff made efforts to resuscitate the child; however, sadly, Fernando later died at Stanford Medical Center on April 13.

Within minutes of their arrival at the hospital, Alderdice asked defendant what had happened.  Defendant said Fernando had fallen off a bed that was two to three feet high onto the carpeted floor, tried to get up, fell

2

again, and bumped his head into a wall heater. Fernando was unresponsive. According to defendant, no other incidents had occurred that might account for the child's comatose state.

Further examination of Fernando revealed bruising on his forehead just above the nose and minor bruising on his legs. A CT scan revealed a subdural hematoma on the right side of Fernando's brain. He had retinal hemorrhages in both eyes and was also bleeding from the gum area underneath his upper lip. The tear to the tissue in the gum area appeared to be fresh and likely occurred within a matter of hours before Fernando was brought to the hospital. Residual blood was discovered in his throat.

Dr. Alderdice, a board-certified emergency medicine physician practicing in that capacity since 1989 and the administrative director for the emergency departments of 10 hospitals, suspected Fernando may have been violently shaken due to the subdural hematoma with the retinal hemorrhages. He thought it was "inconceivable" that the child would have sustained the injuries he had as a result of a fall from the bed and bumping his head into a wall heater.

Alderdice found defendant's demeanor to be extremely unusual and striking because he seemed agitated and angry unlike parents in that situation who were typically fearful and upset over a child's injury. Neither parent told him the child had been hurt before the alleged fall from the bed.

Police Detective Albert Cisneros spoke with defendant and L.E. at Seton Medical Center at 2:00 a.m. on April 9. Defendant told Cisneros he had driven L.E. to the BART station at around 7:00 p.m. the preceding day and Fernando was with them. Upon returning to the apartment, defendant fed, bathed, and changed Fernando. After Fernando fell asleep, defendant took him to the bedroom, and placed him in the center of the queen-sized bed

3

with a pillow on either side of him. He left the room to call L.E. to find out when she would be done at work. Defendant told L.E. words to the effect that "he didn't want to be kept waiting, he had to take care of his business. He didn't want to do this again."

After finishing his call, defendant heard a "boom," went into the bedroom, and saw Fernando "stagger[ ] up on his feet" and then fall forward and hit his head on the wall heater. The child fainted in his arms. He did not know why he did not call 911. He took Fernando with him and went to pick up L.E. at the San Francisco International Airport where she worked. Though Cisneros told defendant his account was inconsistent with Fernando's injuries, defendant repeated the account he had already given, and repeated that account again when he was reinterviewed at the police station. Defendant told Cisneros the injuries to Fernando probably occurred when the child was in the care of L.E.'s sisters.

Cisneros spoke with defendant on a third occasion on June 5, 2005. Defendant initially repeated his earlier account but when Cisneros told him the crime lab found blood on Fernando's clothing, defendant stated for the first time that Fernando had fallen from the couch earlier in the evening with a baby bottle in his mouth. This fall, according to defendant, caused Fernando to bleed from the gum area of his mouth. Once again, he reiterated he had not been happy about how long he had to babysit for Fernando that evening, this caused problems between him and L.E., and he was considering ending his relationship with her. He also reiterated his claim that L.E.'s family members were responsible for Fernando's injuries.

Photos of Fernando taken by Detective Joseph Bocci at the Stanford Medical Center showed "at least one dozen" bruises on Fernando, most of which were on his head "running parallel with the eyebrow line along the

4

bridge of the nose over to the opposite side of the temple." There was "faint bruising" at the "lower jaw line area," and Bocci noticed a reddish circular mark about the size of a 50-cent piece, in the middle of Fernando's chest.

A criminalist determined the bed at the crime scene was two feet two inches in height and was located four feet away from the wall heater. The criminalist observed blood stains on a pillowcase and on the top sheet of the bed, saw no signs of impact on the heater, and found no blood on it. A layer of undisturbed dust was on the heater that would have been displaced if someone had struck the heater. The criminalist opined the heater was not disturbed within the previous nine hours or the night before.

L.E.'s sisters testified Fernando did not have any bumps, bruises, broken bones or other injuries when he and his mother moved out on April 5, 2004. He never had any serious injuries when he lived with them.

Forensic pathologist Thomas Rogers performed Fernando's autopsy. He opined that Fernando died from "multiple blunt injuries," consistent with being beaten to death. In Dr. Rogers's opinion, Fernando's injuries were inconsistent with having been caused by a fall off a bed, landing on a carpet, and then hitting his head against a wall heater. It was significant that Fernando sustained blunt injuries over a wide area of his body.

Neuropathologist Hannes Vogel examined Fernando's brain. Dr. Vogel opined that the subdural hematoma was a result of infliction of traumatic injury. His examination suggested there may have been some injury to Fernando's spinal cord, as well. Vogel believed there was "no chance whatsoever" that Fernando's injuries occurred as a result of a fall from a bed that was two feet off the floor. The multiple severe hemorrhages in front of and behind Fernando's retinas, in Vogel's opinion, were indicative of a blunt force trauma. Based on his examination, Vogel testified that although he

5

could not exclude a severe car accident or fall from a high building as possible causes of Fernando's injuries, it would be a "stretch" to attribute injuries of such severity even to a fall from a two-story building or a car accident without restraints at 30 to 40 miles per hour.

Dr. Peter Egbert of the ophthalmic pathology laboratory at Stanford Medical Center examined Fernando's eyes, and concluded that the pattern of injuries he observed "occurs exclusively . . . in abusive injuries." In his opinion, no explanation other than child abuse accounted for Fernando's retinal hemorrhages.

Forensic DNA analysis revealed that Fernando's blood was on a baby jumper located on the dresser, a baby pajama top found on the shower curtain rod, as well as the pillowcase and top sheet taken from the bed. Fernando's blood was also found on the on the T-shirt defendant was wearing on the night of the incident, along with defendant's own blood. Another stain on defendant's T-shirt was found to contain a mixture of Fernando's and defendant's blood.

The defense rested without introducing any evidence. In closing argument to the jury, defense counsel maintained that defendant's statements to the police about the circumstances of Fernando's injuries were consistent and true, and urged the jury to find that the prosecution failed to prove defendant's guilt beyond a reasonable doubt.

## DISCUSSION

Initially, we recognize the court in *People v. Cole* (2020) 52 Cal.App.5th 1023, 1028, recently held "that *Wende*'s constitutional underpinnings do not apply to appeals from the denial of postconviction relief," and that *People v. Serrano* (2012) 211 Cal.App.4th 496, 500, 503, held the *Wende* " 'prophylactic framework' " does not extend beyond the first appeal of right from a criminal

conviction. Nonetheless, we have reviewed the record and found no arguable issues.

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited the felony-murder rule by adding subdivision (e) to section 189. That subdivision provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the *actual killer*. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e), italics added.)

Section 1170.95 permits defendants convicted of murder to seek retroactive relief if changes in the law made by Senate Bill 1437 would affect their previously sustained convictions. Such is not the case here.

The trial court correctly determined defendant was ineligible for relief as a matter of law because he was the actual killer. We further note in defendant's prior appeal of his conviction, he did not raise the issue of insufficiency of the evidence. Section 1170.95 relief is not available for a defendant who personally commits murder. (See *People v. Cornelius* (2020) 44 Cal.App.5th 54, 58, review granted Mar. 18, 2020, S260410.) Accordingly, we conclude defendant is not entitled to sentencing relief pursuant to section 1170.95.

Having independently reviewed the record, we conclude there are no reasonably arguable issues requiring further review. We thus affirm the order denying defendant's resentencing petition.

7

**DISPOSITION**

The order denying the section 1170.95 petition is affirmed.

MARGULIES, ACTING P. J.

WE CONCUR:


BANKE, J.


SANCHEZ, J.


A159163
*People v. Olivas*

9